UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

MEAGHAN BOLLENBERG, *et al.*,       §
                                     §
            Plaintiffs,              §
                                     §
*versus*                             §        CIVIL ACTION H-03-68
                                     §
                                     §
LANDRY'S RESTAURANT,                 §
                                     §
            Defendant.               §

# Opinion on Partial Summary Judgment

1.  *Introduction.*

    When a customer tips his waiter through a credit card, the restaurant withholds a percentage of the tip to cover its direct cost of converting the charges to cash, principally the issuer's fees. The waiters say that federal law requires that workers receive the gross amount of their tips irrespective of the medium of initial payment. They are wrong.

2.  *Background.*

    Landry's operates restaurants throughout the United States. Landry's allows its patrons to pay with cash or credit card. When a customer charges his meal, Landry's must pay the issuing credit-card company a portion of the total charged amount – including the tip – to turn it into cash. This percentage is the card company's gross compensation.

    At the close of each shift, Landry's converts charged gratuities into cash tips for the shift workers. Because fees vary among card issuers, the restaurant approximates the fee, subtracts it from charged tips, and pays the workers the net in cash. The restaurant pays the workers that day, although it gets paid by the credit card company later.

    Bollenberg and the other plaintiffs assert that Landry's violates the law when it deducts the issuing-card company's fees from gratuities.

3.  *Tip Credit.*

A restaurant's employees must receive at least the minimum wage. 29 U.S.C. § 203(m). If an employee routinely earns more than $30 in tips each month, he is a tipped employee, and his tips are calculated into the hourly wage paid by the employer. 29 U.S.C. § 203(m); 29 U.S.C. § 203(t); 29 C.F.R. § 531.51. The employer is responsible for shortfalls.

Employers may directly pay tipped employees only a fraction of the minimum wage so long as the wages and tips together equal at least the minimum wage. If an employer uses the tip credit, it must pay tipped employees $2.58 per hour or more in direct wages. 29 U.S.C. §§ 203(m)(2), 206(a)(1). Landry's pays its waiters $3.09. The rest of their income comes from tips.

The tip credit applies only if employees know about it and keep all their tips. 29 U.S.C. § 203(m). If they do not, the employer must directly pay them the entire minimum wage for each hour worked, and the worker keeps his tips. Bollenberg, who will be used as a representative plaintiff, cedes that she knew about the credit, but because Landry's discounted the tips by the fee, she says that she did not get to keep "all" her tips.

4.  *Wages, Hours, & Laws.*

As part of the progressive-reform movement, state governments began regulating hours that children and women could lawfully work. The techniques were outright bans, maximum hours per week, higher wages for hours in excess of a limit – usually one and one-half times the regular hourly rate. Grown men were eventually included. Originally the national laws applied to business affecting interstate commerce, but now they essentially apply to everyone. Despite the talk about exploitation and safety, the purpose of the limit on hours was to spread employment, reducing unemployment. Paying most workers routinely one and one-half times their normal rate would exceed their productivity, so employers hired additional people rather than paying fewer people more money for more work.

In 1966, Congress extended the federal wage-and-hour requirements to restaurant employees as well as other retail and service workers. Because restaurant workers

traditionally collected substantial gratuities, the law allows up to 50% of a tipped employee's minimum wages to come from his tips. Fair Labor Standards Amendments of 1966, 80 Stat. 830 (1966).

5.   *Income.*

The federal statute recognized that, for the worker, a customer's tip has the same economic effect as the company's wage. Both are income. Familiar Internal Revenue Service forms show how it treats the two sources. Each year, employers report an employee's "wages, tips, other compensation" on W-2 forms. An employee must report "wages, salaries, tips, etc." as income. Dep't. of the Treasury, Internal Revenue Service, Form 1040, Section 7. The only apparent distinction between wages and tips is the furnishing party. Paraphrasing Henry Ford, the employer does not pays wages. He only handles the money. Wages are always paid by customers. Henry Ford, *My Life and Work* 61 (1922).

6.   *Deductions.*

Bollenberg says that wages and tips are different. She asserts that the law created this distinction by permitting deductions from wages for "board, lodging, and other facilities" but omitting tips from the same language. She says that the only express exception to workers keeping all their tips is pooling. When all tipped workers put their tips into a fund that is then distributed among them, it is a tip pool. Because Congress did not mention deducting credit-card fees as another exception, their occurrence, she argues, is illegal. According to her, waiters must receive their gross tips.

Bollenberg's interpretation is plausible only if tip pools and credit-card fees are analogous. If they were parallel, Congress's failure to mention credit-card fees might weakly suggest that the omission was intentional. Cooperative worker pools are not like discounts for exchange. Food and rooms are not analogous to the cost to convert non-cash receipts into cash.

7.  *The Nature of Tips & Tipping.*

These payments were tips. They were customary additions to the fixed charges of the restaurant. They were earned or at least received for service that the worker performed at the restaurant. Bollenberg's receipt of tips was an integral part of the workplace and all of its relationships. The only question is whether her tips can be counted in the regulatory arithmetic. She relies on Department of Labor's requirement that the customer alone determines (a) whether to tip, (b) how much to pay, and (c) whom to pay. 29 C.F.R. § 531.52. Bollenberg says that discounting tips by the card fee interferes illegally with these decisions by the customer.

Customers are not required to leave tips, but they do. The customer alone determines the amount of the tip. Customers tip for a variety of reasons – usually to reward good service or yield to custom when the service was not good. *See* Ofer H. Azar, *The Social Norm of Tipping: A Review* (2003). Restaurants usually either add 18% gratuities to parties of five or more, suggest gratuities of 15% or more, or leave the tip to the customer's discretion. These are not interferences because the customer is free to disregard them all – to pay more, less, or none. The customer decides whom he wishes to pay. If he leaves no tip, the problem is solved.

The customer chooses the method of payment. Many restaurants have a policy that limits this medium to either cash or credit card, but checks are still a significant component of receipts. Of all retail, non-cash payments in 2000, 85% were by check. Most of these were for less than the average check amount of $925; 29% were for less than the average debit-card purchase amount of $42. Geoffrey R. Gerdes and Jack K. Walton II, *The Use of Checks and Other Noncash Payment Instruments in the United States*, FED. RES. BULL. 360, 368 (Spring 2002). When the customer uses a credit card, he chooses the amount of gratuity and writes it on the receipt and totals the ticket. The customer gives no thought to how exactly the use of a credit card imposes costs on the restaurant and indirectly its workers.

Use of credit cards has gone from a modest beginning in the 1950s to the consumer's dominant medium of payment. Between 1979 and 2000, the number of retail

check transactions rose by about 30%, but the number of retail credit-card transactions rose over 400%. *Gerdes*, FED. RES. BULL. at 361.

8. *Cash & the Rest.*

Labor defines tips as cash that the employee "keeps as his own" or a negotiable instrument that is payable at face value and "transferred by the employer to the employee." *See* 29 C.F.R. § 531.53. Implicit in the second type is the recognition that the amount transferred to the employee may differ from the tip's face value. In the case of a charged tip, the employee keeps the net tip after its conversion to cash. *Myers v. The Copper Cellar Corp.*, 192 F.3d 546, 554 (6th Cir. 1999).

A customer pays his food bill for $100 and a tip of $15 through a credit card. If both worker and restaurant use the restaurant's banking and card accounts, the restaurant is credited with $112.70, hypothetically; this is the $115 charge less 2% fee. The restaurant's share is $98.00, and the waiter's share is $14.70. The customer may pay more or less than the $115.00 because of fees or rebates in his arrangement with his issuing bank.

With a credit card, the customer pays the tip to the worker, but he mixes it into a single bill of exchange delivered to the employer. When the bill is discounted by fees, the worker and employer each receive his proportional share of the net cash proceeds; these net proceeds from the charge are the gross proceeds from the customer. *See* Robert M. Hunt, *An Introduction to the Economics of Payment Card Networks*, 2 Review of Network Economics 80, 82 (2003).

A customer pays a food bill for $100 and tip of $15 with a check. The restaurant disburses $15 in currency to the worker at the shift's end. Five days later, the check is returned as uncollectible. At that point, the employer has tipped the worker, and it may recover from the worker the cash advance.

A customer pays for his food and tip by leaving the correct value but in Italian lira. If the restaurant pays the worker his full tip in American currency, when it converts the liras to dollars, the net cash to the employer will be less than the face value of the liras because the money exchanger will charge a fee, so it may pay the worker only the exchanged value.

All of these scenes could be handled differently. The employer could wait until checks clear before paying the worker. Waiters could ask for their tips in cash. Waiters could have their own merchant accounts. Waiters could take the foreign currency to the *cambio.* Each solution has its own costs. These include delay, uneconomical accounts, inconvenience, excessive bookkeeping, and, most important, aggravation of the customers on whom all depend. Waiters who decided to set their individual policy about how customers could pay them are likely to find their tips diminished and employers frustrated.

Also, it is significant that Labor – the responsible agency – represents that it will not challenge deductions from charged tips for conversion fees so long as the amount withheld does not exceed the fee of the credit-card company. U.S. DEPT OF LABOR FIELD OPERATIONS HANDBOOK § 30d05(a) (Dec. 9, 1988). The department's website says this, too. While neither these statements nor the regulation is law, at a minimum they evaporate the authority of Bollenberg's quotations. Bollenberg's selectivity lacks candor.

Being allowed to estimate is important. On a given night, customers will use cards whose issuers charge a variety of rates and fees, making it uneconomical to attempt to account precisely for each deduction from each part of each transaction. Undermining the convenience and efficiency of credit-card use would harm the customers, employers, and their workers. Whatever happens in this case, the academics and lawyers will move to another cause, but the poor workers could have been left with a victory that hurt everybody.

9. *Benefit.*

The waiters say that the restaurant should absorb the fees since it benefits from customers' ability to charge their meals. This is populist mush.

Bollenberg and other workers benefit from customers' being able to pay with credit cards, too. She benefits from the restaurant's paved parking lot, electricity, capable cooks, fresh groceries, stoves, advertising, and tables – by all of them she earns her living. Yet she pays for none of it.

Landry's does not have to take the tip credit. The restaurant could simply pay its waiters a cash wage directly at or above the statutory minimum and keep all the tips.

While this might simplify Landry's accounting, Bollenberg might also earn significantly less per hour than she does now. The current system allows both worker and employer to use a custom to increase both their incomes and to motivate the workers by the incentive of earning tips higher than the lowest traditional rate that good manners permit customers to leave. Like many things that work in the real world, this was not engineered but evolved.

10.  *Frivolity in Litigation.*

Bollenberg also "argued" that Landry's was not "forced" to use the tip credit or to take credit cards. This shows that the complaint is more of a press release than a pleading crafted with attention to the facts, law, and logic. If someone is not forced to do something, the absence of compulsion does not make the act legal or illegal. If force is involved, it could change the way that the law looks at the transaction. Landry's chose an option within the wage and hour laws.

Bollenberg made choices too. She was not forced to accept tips by credit cards. She could have refused them, and if her income fell below the legal minimum, Landry's would have had to pay her the difference. It is likely that she would not have been free to instruct the customers on her preferences because that would have interfered with the business. She was paid to meet their needs, not the other way around. Of course, this argument – like the economic-benefit one – was put in the case because she had no good arguments.

Landry's has 30 days to move for compensatory sanctions for this segment of the case. The statute is reasonably clear, Labor's regulations are very clear, and the only judicial decision on the issue is opposite Bollenberg's position.

She makes no good-faith argument for a change or extension of the law. First, she cannot change the statute or regulation. Second, the basis of her attack of the existing case is non-existent: she says that the court made its finding "without citing any statutory support." Pls.' Memo. in Supp. of Part. Summ. J., dkt. 33, at 11. The court was interpreting a statute, and the court as well as both parties were relying on the same statute. After an exhaustive analysis, the court said:

> Before an employee can be entitled to attain any funds on account of a charged customer gratuity, that debited obligation must be converted to cash.
>
> . . .
>
> A gratuity becomes a "tip" only after the employer has liquidated it and transferred the proceeds to the tipped employee; prior to that transfer, the employer has an obvious legal right to deduct the cost of converting the credited tip to cash.

*Myers*, 192 F.3d at 553, 554.

11. *Conclusion.*

Neither the statute nor the regulations contemplate that employers absorb the cost of converting charged tips to cash. The law does not force employers to repay workers because they have withheld the costs of conversion. Landry's may deduct an amount proportionate to the fees for those tips.

If Bollenberg contends that Landry's deductions have been unreasonable, she will have the opportunity to raise that issue by filing a bill of particulars about Landry's discount approximations within 30 days of this opinion.

Bollenberg's motion for partial summary judgment will be denied, and Landry's will be granted on the lawfulness of deducting the discount, fee, or other exchange costs to arrive at a net present American cash amount.

Signed August 30, 2005, at Houston, Texas.

_____
Lynn N. Hughes   USDJ
United States District Judge